# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| DONISE CARTER, etc., | ) | CASE NO. 1:15CV37 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | **OPINION AND ORDER** |
| | ) | |
| MARC J. McNAUGHTON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CHRISTOPHER A. BOYKO, J.:**

This matter comes before the Court upon the Motion (ECF DKT #83) of Defendants, Marc J. McNaughton, M.D. and Prime Health, Inc., in Limine to Preclude Testimony or Argument based on Testimony of Dr. Lawrence Mendel. The Court determined that the Motion was in the nature of a *Daubert* challenge; and therefore, ordered a hearing which was conducted on April 3, 2018.

## I. BACKGROUND

This civil rights and wrongful death action was initially filed on January 8, 2015, against Lake County, Lake County Sheriff Daniel A. Dunlap, Nita L. Brickman, Marc J. McNaughton, M.D. and Prime Health, Inc. An Amended Complaint was filed on July 27, 2016. On August 16, 2016, Defendants Brickman, Lake County and Dunlap were dismissed with prejudice from the lawsuit pursuant to Stipulation (ECF DKT #54 & #55).

Plaintiff's decedent, Dondrea Carter, was an inmate at the Lake County Adult Detention Facility ("LCADF") in May of 2014 when she complained of chest pain, jaw pain, dizziness, nausea and anxiety. Nurse Brickman administered an EKG, provided Dondrea

with four packets of Pepto Bismol and returned Dondrea to her cell. Brickman informed Dr. McNaughton, the jail physician, when he arrived later, of Dondrea's medical complaints and that the results of the EKG were normal. Dr. McNaughton did not see Dondrea nor did he review the EKG results. A short time afterward, Dondrea was found unresponsive in her cell. She was transported to the local ER where she died on May 26, 2014, from a heart attack due to atherosclerotic coronary artery disease.

Donise Carter, Dondrea's mother and administratrix of her estate, brings this action for wrongful death, malpractice, negligence and violation of the Fourteenth and Eighth Amendments to the United States Constitution under 42 U.S.C. § 1983. Plaintiff alleges that Defendants failed to provide adequate medical care to Dondrea Carter, an inmate in the LCADF. Plaintiff specifically contends that McNaughton's inaction amounted to deliberate indifference to Dondrea's serious medical needs.

Plaintiff's civil rights claim relies upon the Eighth Amendment's cruel and unusual punishment clause which obligates the government to provide medical care for individuals punished by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "Treatment of a prisoner violates the Eighth Amendment when it constitutes 'deliberate indifference to [the] prisoner's serious illness or injury.'" *Estelle*, 429 at 104-05; *Jones*, 845 F.Supp.2d at 834. To establish an Eighth Amendment claim, a plaintiff must prove both an objective and a subjective component. *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010), citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective aspect requires proof of a "sufficiently serious" medical need. *Id*. To meet the subjective burden, a plaintiff must demonstrate that the official being sued: (1) subjectively knew of a risk to the inmate's

health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk. *Jones*, 625 F.3d at 941, citing *Farmer*, 511 U.S. at 837. "Deliberate indifference" means more than mere negligence, but less than acting purposefully or with knowledge that harm will result. *Farmer*, 511 U.S. at 835.

Plaintiff's state law claims of wrongful death and medical malpractice require Plaintiff to demonstrate by a preponderance of the evidence that Defendant McNaughton deviated from the ordinary standard of care exercised by physicians in the relevant medical community and that the deviation was the proximate cause of Plaintiff's injury.

Plaintiff offers the expert testimony of Dr. Lawrence Mendel, who is licensed to practice medicine in Ohio and is certified by the American Osteopathic Board of Family Practice. Mendel is also a Certified Correctional Healthcare Professional, National Commission on Correctional Healthcare and a Fellow, Society of Correctional Physicians.

In their Motion in Limine, Defendants assert that Dr. Mendel does not opine that McNaughton's care exhibited deliberate indifference to a serious medical need. Defendants criticize Dr. Mendel's opinion that physicians in a jail setting must perform a comprehensive evaluation of a patient's chest pain, including reviewing EKG results, within one hour of the patient reporting chest pain. Finally, Defendants argue that Dr. Mendel's opinion on proximate causation is only speculative.

## II. LAW AND ANALYSIS

**Expert Testimony**

Pursuant to Federal Rule of Evidence 702, an expert by virtue of knowledge, skill, experience, training or education may provide testimony to assist the trier of fact to

understand the evidence or to determine a fact in issue if the expert testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has applied the principles and methods reliably to the facts of the case.

The standard set in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) requires "that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses." *Redmond v. United States*, 194 F.Supp.3d 606, 615 (E.D.Mich. 2016) (citing *Daubert*, 509 U.S. at 591-93). "[E]xpert testimony is not admissible unless it will be helpful to the factfinder." *Redmond, id.* Expert testimony is not helpful when it is unreliable or irrelevant or "when it merely deals with a proposition that is not beyond the ken of common knowledge." *Id*. "The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

"The expert's opinion must be expressed in terms of probability, not possibility; while no "magic words" are required, the opinion must be couched within the reasonable degree of certainty." *Rorick v. Silverman*, No. 1:14-cv-312, 2015 WL 9303125, *6 (S.D.Ohio Dec.12, 2015) (quoting *Ochletree v. Trumbull Mem. Hosp.*, No. 2005-T-0015, 2006 WL 533502, *6 (Ohio App. 11th Dist. Mar. 3, 2006)).

**Standard of Care**

In order to establish a medical malpractice claim, a plaintiff must present evidence of:

(1) the standard of care, (2) defendant's failure to meet that standard, and (3) a direct causal connection between the medically negligent act and the injury suffered. *Bruni v. Tatsumi*, 46 Ohio St.2d 127, syllabus (1976). "Expert testimony on the standard of care and a defendant's failure to adhere to the standard is typically required, unless the lack of skill in rendering care is so clear and apparent that it is within common knowledge and understanding of a jury." *Rorick*, *supra*; *Buerger v. Ohio Dept. of Rehab. & Corr.*, 64 Ohio App.3d 394, 399 (Ohio App. 1989).

> Dr. Mendel opines:
>
> The applicable standards of medical care for patients presenting with chest discomfort at risk of cardiac ischemia require that [sic] an accurate medical history, physical exam, EKG testing, and development of a differential diagnosis. (Preliminary Report, ECF DKT #65 at 4).
>
> The applicable standards of care require a rapid and comprehensive evaluation of chest pain with a goal to initiate therapy within one hour of onset for patients identified with suspected acute myocardial infarction (MI). *Id*.
>
> The failure to review the EKG of a patient with acute chest pain and known risk factors, and to defer evaluation to a nurse with unknown qualifications is a substantial departure from the standard of care and amounts to gross negligence. *(Id*. at 5; Updated Summary of Opinions, ECF DKT #83-2 at 3).
>
> The applicable standards of care require a rapid and comprehensive evaluation of chest pain with a goal to initiate therapy within one hour of onset for patients identified with suspected acute myocardial infarction (MI). (ECF DKT #83-2 at 1).
>
> Dr. Mendel was questioned about his opinion on standard of care at the Oral Hearing:
>
> Q. And did Dr. McNaughton breach the standard of care for treating patients with chest pain?
>
> A. Yes.
>
> ********

Q. Now, how substantial was his departure from the standard of care?

A. I believe it was a very serious departure.

********

Q. So was the need to read the EKG obvious if he wanted to complete the differential diagnosis?

A. Yes.

(Hearing Transcript, ECF DKT #110 at 21-22).

On cross-examination, Dr. Mendel testified:

Q. Regarding the – is it fair for me – I'm just trying to get an idea of your standard of care opinion. Is it fair for me to say that your opinion deals with how promptly there should be an EKG overread by a physician?

A. Part of it, yes.

Q. All right. And your opinion is that there – you have a standard in jails and prisons where physicians are required to review EKGs within an hour. Correct?

A. That's the expectation that they used where I – the facility I was working with.

********

Q. As a matter of fact, Doctor, although you hold that opinion about the standard requiring an EKG overread within 1 hour by a physician, you're not sure if others share that opinion, correct?

A. It's not a consistent standard across the country in correctional facilities.

Q. You're not sure if others share that opinion, sir. That's what you told me at your deposition, correct?

A. Yes, that's correct.

********

Q. None of them [professional societies in correctional health] have standards that set forth the opinion that you've expressed here today that a physician, whether in the facility or outside the facility, is required to review an EKG within 1 hour, correct?

A. I don't believe that they have specifically commented on that requirement.

(Hearing Transcript, ECF DKT #110 at 35-36, 38, 41-42).

The Court finds, upon consideration of Dr. Mendel's reports and testimony, that his opinion on the standard of care is not reliable or relevant. Dr. Mendel personally advocates a standard of care requiring physicians (like Dr. McNaughton) in jails and prisons to review EKG results within one hour. He admits that it is not a consistent standard nationally. He is unable to demonstrate that this standard of care is found in the applicable literature, peer-reviewed studies or the policies of professional correctional health societies. In fact, he concedes that the standard is not established in the relevant medical community since he made a recent presentation in November of 2017, to the National Commission on Correctional Healthcare concerning "*evolving requirements*" for EKG overreads. This presentation post-dated the disclosure of Dr. Mendel's expert reports.

An expert may testify in the form of an opinion if it will assist the trier of fact and if the testimony is the product of reliable principles and methods. Federal Rule of Evidence 702; *Redmond*, 194 F.Supp.3d at 614-615. The Court finds that Dr. Mendel's opinion on the standard of care, requiring a physician's overread of EKG results within one hour, is merely a personally-held one. Therefore, it is irrelevant, unreliable and of no help to a lay jury.

**Proximate cause**

Proximate cause is an element of each of Plaintiff's claims. The Supreme Court of Ohio has held that the expert's opinion as to what was the proximate cause must be stated at a level of probability, not mere possibility. *See, Stinson v. England*, 69 Ohio St.3d 451, syllabus (1994); *Ochletree*, No. 2005-T-0015, 2006WL 533502 at *6. "At a minimum, the trier of fact must be provided with evidence that the injury was more likely than not caused by defendant's negligence [or deliberate indifference]. Opinions expressed with a lesser degree of certainty must be excluded as speculative." *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St. 3d 367, 369 (1986). Thus, Dr. Mendel's opinions as to the causal link between Dr. McNaughton's alleged tortious conduct and Dondrea Carter's death must be held to a reasonable degree of medical probability.

> Dr. Mendel opines:
>
> It is my opinion that if the EKG had been reviewed by Dr. McNaughton when he arrived at the facility, Dondrea Carter would have been sent to the hospital and would have survived to discharge. (Preliminary Report, ECF DKT #65 at 5; Updated Summary of Opinions, ECF DKT #83-2 at 4).
>
> In the absence of infarction, there was no certainty of progressive cardiac damage and her sudden death from cardiac arrhythmia was not inevitable if she had been appropriately evaluated and sent out to the hospital. (ECF DKT #83-2 at 2).
>
> The probability of successful treatment of a life-threatening cardiac arrhythmia while under the care of EMS or the local hospital is substantially higher and the probability of a successful outcome was at least twice as high compared to her prognosis in remaining in an environment without continuous cardiac monitoring. (*Id*. at 3).
>
> Dr. Mendel was questioned about proximate cause at the Oral Hearing:
>
> Q. Now, if Dondrea had her cardiac event in the hospital, can you give an opinion to a

reasonable degree of medical probability whether she would have been resuscitated?

    A. Yes.

********

    Q. And what is your opinion with respect to whether she would have been resuscitated?

    A. I believe it's substantially more likely than not that she would have been successfully resuscitated to return a spontaneous circulation.

********

    Q. So, . . . is it your opinion to a reasonable degree of medical probability that Dondrea Carter would have been resuscitated had she gone unresponsive in a monitored setting at the hospital?

    A. Yes.

(Hearing Transcript, ECF DKT #110 at 25, 27-28).

    On cross-examination, Dr. Mendel testified:

    Q. Even with all of the things that – or interventions that you say should have been done, as you sit here today, you can't say to a reasonable degree of medical probability that Ms. Carter would have survived. Correct?

    A. I can say that it's more likely – much more likely than not that she would have been successfully resuscitated and then I would defer to the testimony of Dr. Magorien (Defendants' cardiology expert) who said that she had a very good chance of survival once she was in the hands of the cardiologist.

********

Q. The primary outcome for patients who sustain a cardiac arrest in the hospital is death. Correct?

A. Yes. But it's substantially higher when that arrest occurs in the emergency department ...

Q. In one of the studies you provided, 78 percent of the patients were already at monitored locations like the ICU. And yet the majority of them died. Correct?

A. Yes. And those patients had a variety of significant medical conditions.

********

Q. Okay. So you can't say to a reasonable degree of medical probability that, for example, oxygen or baby aspirin or defibrillation or any one of those interventions would have led to the survival of Ms. Carter. Correct?

********

Q. You can't say it to a reasonable degree of probability. Right, Doctor?

A. No.

Q. Am I correct? We have a double negative.

A. Yes.

Q. I'm correct?

A. Yes.

********

Q. Doctor, you cannot say to a reasonable degree of medical probability that had Dondrea Carter been admitted to any hospital on May 25th, 2014, that she would have survived the hospitalization. Correct?

A. Correct.

(Hearing Transcript, ECF DKT #110 at 49-50, 51-52, 53-54, 59).

Mindful of its gatekeeping obligation under *Daubert*, the Court must ensure the reliability and relevancy of all expert testimony offered in this case. Therefore, the Court finds that Dr. Mendel has not opined to the appropriate degree of medical probability that Dr. McNaughton's delay in reviewing the EKG results was a proximate cause of Dondrea Carter's injury (*i.e*., death). At best, Dr. Mendel testifies that Dondrea Carter's chances of survival would have been substantially better had she suffered her cardiac arrest and received treatment in a hospital setting equipped to provide coronary care. This conclusion is not beyond the ken of a lay jury.

### III. CONCLUSION

For these reasons, the Motion (ECF DKT #83) of Defendants, Marc J. McNaughton, M.D. and Prime Health, Inc., in Limine to Preclude Testimony or Argument based on Testimony of Dr. Lawrence Mendel is granted. The opinions and testimony of Dr. Mendel are, therefore, excluded.

**IT IS SO ORDERED.**

                                      **s/ Christopher A. Boyko**
                                      **CHRISTOPHER A. BOYKO**
                                      **United States District Judge**

Dated: April 4, 2018